**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JERMAINE WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-CV-7024 |
| | ) | |
| MICHAEL WHITE, ERIC REYES, | ) | Judge Manish S. Shah |
| SEBASTIAN FLATLEY, BRIAN DALY, | ) | Magistrate Judge M. Rowland |
| RAULBAEZA, JR., THOMAS GAYNOR, | ) | |
| the CITY OF CHICAGO, | ) | JURY TRIAL DEMANDED |
| THOMAS FINNELLY, COOK COUNTY, | ) | |
| ILLINOIS, and UNIDENTIFIED | ) | |
| CHICAGO POLICE OFFICERS AND | ) | |
| COOK COUNTY STATE'S ATTORNEY | ) | |
| INVESTIGATORS, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Now comes Plaintiff, JERMAINE WALKER, by and through his attorneys, COGAN &

POWER and THE FAKHOURI FIR, and complaining of Defendants MICHAEL WHITE (Star

No. 860), ERIC REYES (Star No. 10126), SEBASTIAN FLATLEY (Star No. 13734), BRIAN

DALY (Star No. 9364), RAUL BAEZA, JR. (Star No. 4918), THOMAS GAYNOR (Star No.

5069), the CITY OF CHICAGO, THOMAS FINNELLY, COOK COUNTY, ILLINOIS, and

unidentified Chicago police officers and Cook County State's Attorney investigators, states as

follows:

### Introduction

1.     Plaintiff Jermaine Walker was a computer science student at Fisk University when

he fell victim to misconduct all too common in today's society: The Defendant police officers

planted drugs on him, fabricated evidence, and lied about it, causing Mr. Walker to spend a decade of his life falsely imprisoned for a crime he did not commit.

2.      Mr. Walker's case is atypical in two respects. One, the Defendants were caught framing Plaintiff, leading to Mr. Walker's exoneration and his later receipt of a certificate of innocence. Two, Defendant Finnelly, a member of the Cook County State's Attorney's Office, deliberately took misleading photographic evidence as part of the Defendants' plot to frame Plaintiff, a plot that took ten years to unravel.

3.      Mr. Walker has been released from his wrongful incarceration, but has struggled to recover all that he has lost. He missed the most formative years of his life, when his peers were starting their careers, getting married, and having children. He brings this suit to seek such redress for these losses as the law allows.

## JURISDICTION AND VENUE

4.      This action is brought under 42 U.S.C. § 1983 to address the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution and under state law.

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

6.      Venue is proper under 28 U.S.C. § 1391(b) because, upon information and belief, all defendants reside in this district, and nearly all of the events giving rise to the claims asserted herein occurred within this district.

## THE PARTIES

7.      Plaintiff JERMAINE WALKER is a resident of Illinois. At the time of his arrest he was studying computer science at Fisk University on a full scholarship.

8.      Defendant Sergeant MICHAEL WHITE was at all times relevant to this Complaint a Chicago Police Sergeant (Star No. 860) acting under color of law and within the scope of his employment.  Defendant White is sued in his individual capacity.

9.      Defendant Officer ERIC REYES was at all times relevant to this Complaint a Chicago Police Officer (Star No. 10126) acting under color of law and within the scope of his employment.  Defendant Reyes is sued in his individual capacity.

10.     Defendant Officer SEBASTIAN FLATLEY was at all times relevant to this Complaint a Chicago Police Officer (Star No. 13734) acting under color of law and within the scope of his employment.  Defendant Flatley is sued in his individual capacity.

11.     Defendant Officer BRIAN DALY was at all times relevant to this Complaint a Chicago Police Officer (Star No. 9364) acting under color of law and within the scope of his employment.  Defendant DALY is sued in his individual capacity.

12.     Defendant Officer RAUL BAEZA was at all times relevant to this Complaint a Chicago Police Officer (Star No. 4918) acting under color of law and within the scope of his employment.  Defendant BAEZA is sued in his individual capacity.

13.     Defendant Officer THOMAS GAYNOR was at all times relevant to this Complaint a Chicago Police Officer (Star No. 5069) acting under color of law and within the scope of his employment.  Defendant GAYNOR is sued in his individual capacity.

14.     Defendant THOMAS FINNELLY was at all times relevant to this Complaint an investigator employed by the Cook County State's Attorney's Office acting under color of law and within the scope of his employment.  Defendant Finnelly is sued in his individual capacity.

15.     Defendant the CITY OF CHICAGO is a political subdivision of the State of Illinois. At the time of the events giving rise to this Complaint, the City of Chicago was the employer of

Defendants Michael White, Eric Reyes, Sebastian Flatley, Brian Daly, Raul Baeza, Thomas Gaynor, and Unidentified Chicago Police Officers (together, "Defendant Officers") who acted pursuant to the City's policies and practices. As the employer of the Defendant Officers, the City of Chicago is liable for their torts under the doctrine of respondeat superior.

16.    Defendant COOK COUNTY, ILLINOIS (the "County") is a political subdivision of the State of Illinois. At all times relevant to this Complaint, the County funded the operations of the Cook County State's Attorney's Office, which employed Defendant Thomas Finnelly and Unidentified Cook County State's Attorney's Investigators. Illinois law requires that the County indemnify claims against state employees where the County funds the state office that employs them.

17.    UNIDENTIFIED CHICAGO POLICE OFFICERS were at all times relevant to this Complaint officers serving in the Chicago Police Department. They are sued in their individual capacities.

18.    UNIDENTIFIED    COOK    COUNTY    STATE'S    ATTORNEY'S INVESTIGATORS were at all times relevant to this Complaint investigators employed by the Cook County State's Attorney's Office. They are sued in their individual capacities.

## FACTUAL ALLEGATIONS

19.    On the evening of February 21, 2006, Mr. Walker and his brother Russell Walker were headed to a family gathering at their sister's house on the north side of Chicago.

20.    Mr. Walker was at that time a student at Fisk University in Tennessee, where he was studying computer science and doing research on superconductivity, all on a full scholarship.

21.    Mr. Walker was driving his car and Russell was in the passenger seat.

22.     At about 8:30 pm, the brothers were parked in the parking lot of J.J. Pepper's at 4800 North Sheridan Road, where they had stopped to make a purchase before going to their sister's home.

23.     As he pulled out of the parking lot, Mr. Walker turned onto West Lawrence Avenue.

24.     He immediately noticed lights from a police car behind him, and, understanding that he was being directed to pull over, he turned into an alley adjacent to Lawrence House, an apartment building at 1020 West Lawrence Avenue.

25.     Mr. Walker had not committed any infraction that would have justified being stopped by the police.

26.     The Defendant Officers followed Mr. Walker's car into the alley.

27.     Defendant Reyes approached Plaintiff's car with his gun drawn and requested his driver's license, insurance, and registration.

28.     Despite having been unjustly stopped, Mr. Walker provided his valid driver's license, current registration, and current insurance to Defendant Reyes.

29.     Mr. Walker asked Defendant Reyes why he had been pulled over, but Reyes refused to give him any explanation.

30.     Defendant Reyes then ordered Mr. Walker to get out of the car so the officers could search it.

31.     Defendant Reyes had no basis to stop Plaintiff, let alone to demand that he exit his car and submit to an illegal search of his car.

32.     Knowing that the Defendants had no grounds to search the car, Mr. Walker declined to exit his car. Instead, believing that his rights were being violated, Mr. Walker asked to speak to a sergeant.

33.     Defendant Sergeant White arrived at the scene shortly thereafter.  He asked Mr. Walker why he needed to speak to a sergeant. Mr. Walker responded that he had been pulled over for no reason and the Defendant Officers had not given him any justification for the stop.

34.     Rather than discipline his subordinate officers, or articulate to Mr. Walker why he had been pulled over, Defendant White also ordered Mr. Walker out of his car without justification.

35.     Mr. Walker was increasingly afraid for his safety, given the Defendant Officers' unlawful traffic stop, menacing display of a weapon, and hostile tone when they tried to violate his constitutional right to be free of unreasonable searches and seizures.

36.     When Mr. Walker delayed exiting his car, the Defendant Officers began screaming at him. Fearing what the Defendant Officers might do, Mr. Walker then exited the car, still without knowing why he had been stopped or why he was being ordered out of his car.

37.     The Defendant Officers were irate that Plaintiff had not immediately submitted to their unjust display of authority. As soon as he exited his car, Defendants White, Reyes, and Flatley began to beat Mr. Walker.  The remaining Defendant Officers either participated in the unjust use of force along with Defendant Officers White, Reyes, and Flatley, or watched the unjustified assault on Mr. Walker and, despite having the opportunity to prevent the abuse, did nothing to intervene.

38.     A surveillance camera was mounted in the alley where the events described above transpired. The camera was in plain sight to everyone present.

39.     That camera, which fed images of the alley to an employee inside the adjacent Lawrence House, was part of Lawrence House's security system.

40.     While still inside his car, Mr. Walker noticed the camera capturing the events. After the Defendants began beating him, he pointed out the camera to the Defendant Officers and told them their unconscionable behavior was being recorded.

41.     Nevertheless, Mr. Walker was beaten several times by the Defendants and then handcuffed and arrested. Despite having committed no crime, Mr. Walker was falsely charged with possession with intent to distribute narcotics within 1,000 feet of a school.

42.     In their police reports of the incident, the Defendant Officers falsely claimed that Plaintiff possessed narcotics while in the alley. This was a complete fabrication.

43.     The Defendants inventoried narcotics and falsely claimed that the drugs had been possessed by Plaintiff. Those drugs were later used as evidence against Mr. Walker at trial.

44.     Defendant Officers White, Reyes, Flatley, Daly, Baeza, and Gaynor all either falsely reported that the narcotics were recovered from Plaintiff or they knew other Defendant Officers were falsely reporting that the narcotics were recovered from Plaintiff and failed to prevent the fabrication despite an opportunity to do so.

45.     All along, Mr. Walker contended that he had not been dealing narcotics, but even if he had been, he would not have done so in front of the camera in the alley recording all of the events.  But without any photographs or witnesses of his own, he could not corroborate his account.

46.     At trial, Defendant Finnelly testified that he was assigned by the State's Attorney's Office to go to the scene of the arrest to take pictures of the alley and to photograph any camera that might be there, as part of his duties as an investigator for the Office.

47.     Despite the presence of the camera in plain view on the west wall of the alley, Defendant Finnelly intentionally did not photograph it. He photographed other areas of the alley,

but deliberately avoided photographing the location where Plaintiff's car had been stopped below the camera.

48.     Specifically, the camera at issue is located just inside the mouth of the alley, clearly visible. The photographs below accurately portray the location of the camera and the lack of obstructions surrounding the camera on February 21, 2006:



49.     An inspection of Defendant Finnelly's photographs demonstrates his intentional misconduct.

50.     When directed to photograph the camera in the alley, Defendant Finnelly positioned himself in such a manner that it would appear he was photographing the entire alley, but in fact he intentionally prevented the camera from appearing in all nine of his photographs of the alley.

51.     For example, rather than photographing the alley from the mouth of the alley, which would depict the camera on the left side of the frame just inside the alley, Defendant Finnelly walked into the alley just far enough that the camera would not appear in the photograph.

52.     The following is an accurate reproduction of the photograph taken by Defendant Finnelly which was introduced as People's Exhibit 4 at Plaintiff's trial, suggesting that there was no camera in the alley:



53.     Defendant Finnelly also photographed the alley from the opposite direction, facing south. However, he deliberately chose a vantage point that would obscure the camera. Specifically, he stood to the right side of the alley, facing south, so that the telephone poles in the alley would hide the camera.

54.     The following is an accurate reproduction of the photograph taken by Defendant Finnelly which was introduced as People's Exhibit 8 at Plaintiff's trial, likewise making it appear that there was no camera in the alley:



55.     Knowing that his sole assignment was to photograph any cameras in the alley, Defendant Finnelly then proceeded to take close-up photographs of any objects that might appear to be cameras in the overviews of the alley that he photographed, depicted above. Taking close-ups to rule out the possibility that the objects might be cameras made it appear as if Defendant Finnelly had scoured the alley for anything that might appear to be a camera, but found nothing.

56.     The following is an accurate reproduction of the photograph taken by Defendant Finnelly which was introduced as People's Exhibit 9 at Plaintiff's trial:



57.     The following is an accurate reproduction of the photograph taken by Defendant Finnelly which was introduced as People's Exhibit 10 at Plaintiff's trial.



58.     Prosecutors relied on the false police reports and the misleading photographs of the alley in deciding to and continuing to prosecute Mr. Walker.

59.     Mr. Walker could not afford his bail, so he was forced to prepare for trial while imprisoned in Cook County Jail.  Knowing he was innocent, Mr. Walker asserted his right to a speedy trial as his only means to gain his release from the false charges.

60.     In preparation for trial, Mr. Walker asked the court to appoint an investigator to obtain photographs of the camera in the alley and to locate witnesses who could testify that the camera was there on February 21, 2006.  Mr. Walker planned to use this evidence to support his truthful defense that the drugs had been planted, because he would not have engaged in a drug deal in front of a camera that might be recording the transaction.

61.     The court, unfortunately, denied this request, permitting Defendant Finnelly's manipulated photographs to stand unrebutted.

62.     At trial, Defendant Finnelly testified that he walked the entire length of the alley, but denied having seen any camera there.

63.     This testimony was false.

64.     Defendants White and Reyes also testified at trial that there was no camera in the alley.

65.     Their testimony was also false.

66.     Based on Defendants' falsehoods and fabrications, the State was able to paint Plaintiff as a liar at his trial, arguing:

>        There was a camera in the alley? Ladies and gentlemen, there is absolutely no evidence of that.  Witness after witness after witness took that stand and told you there is no camera. You have pictures of the alley, including close-ups that show you there is no camera.

If there was a camera, do you think defendant and his brother would be stupid enough to deal drugs in front of it? Come on. Don't you think they would pick another alley? Get real. The police officers planted drugs? This is the most baffling of all.

67.　Despite his innocence, and based on Defendants' false police reports, their planted evidence, and the misleading photographs, Mr. Walker was convicted and sentenced to 22 years imprisonment.

68.　Mr. Walker appealed his conviction, arguing that the trial court was wrong to deny him an investigator. Relying heavily on Defendant Finnelly's false testimony and misleading photographs, the State argued that access to an investigator would not have changed anything, because "the evidence and testimony demonstrated that there was no camera in the alley where defendant was arrested."

69.　The Illinois Appellate Court agreed with the State, stating that "the overwhelming evidence at trial supports a finding" that there was no camera in the alley. Accordingly, based on Defendants' lies, the appellate court ruled that sending the case back to appoint an investigator would achieve nothing.

70.　On May 4, 2015, Mr. Walker filed a petition for post-conviction relief presenting new evidence proving the camera's existence and demonstrating that the Defendants lied under oath.

71.　While the petition was pending, the Cook County State's Attorney investigated Mr. Walker's claims about the existence of the camera. That investigation led the State's Attorney to conclude that Defendants Finnelly, Flatley, and Reyes had perjured themselves.

72.　The State then filed its own motion to vacate Mr. Walker's conviction and sentence, and to dismiss the charges against him.

73.     On March 25, 2016, after more than ten years of incarceration, the Cook County

Circuit Court vacated the indictment against Mr. Walker and dismissed all charges.

74.     In doing so, the court said:

> Well, obviously there were witnesses that were sworn under oath that testified and presented evidence corroborating their testimony. And when someone has taken an oath to tell the truth and testifies, there is a presumption that they are going to tell the truth. Obviously, we have found out that that does not occur. A severe injustice was done here. But everybody in the court system was relying on the information and the photographs that were sworn to as a truth, and it is very disturbing and upsetting, especially as a judge, to be involved in a system where an officer, especially an officer of the court, would come in and swear under oath to something that was not true. That's a terrible thing and very disheartening to find out that someone has done something like this.
>
> *   *   *
>
> Well, Jermaine, you are very kind in this horrible situation that you have been put in. There's no words that can explain how sorry I am that the justice system failed in this case. And we worked very hard to try to ensure that the truth comes out and, you know, it just took so long for it to come out.
>
> It's really outrageous that police officers and an officer of the State's Attorney's office swore under oath here and actually backed it up with photographs that didn't even fit the relevant situation that we had in your case and, you know, on behalf of the entire system, I am so sorry that this has happened to you, and we hope that it, you know, does not ever happen again.
>
> I have been on—I was a State's Attorney for 14 years, a judge for 21 years, and this has never happened. I have never had to do this, and I am sickened by the fact that I have had to do it at all since I have been here. And I know that from the very moment that I saw the affidavit that this camera did in fact exist, that I had everybody give it their utmost attention so that we can get it resolved and so that we could come to the just outcome and that you could be released.
>
> So, at this time, the defendant's conviction will be vacated.

75.     On April 27, 2016, the same court granted Mr. Walker a Certificate of Innocence.

## MR. WALKER'S DAMAGES

76.     Mr. Walker spent ten years in prison for a crime that he did not commit.

77.     As a result of his wrongful incarceration, Mr. Walker was stripped of the pleasures

of basic human experience, from the most quotidian to the most important, which all free people

enjoy as a matter of right. For ten years, he was unable to share holidays, births, funerals, and other life events with loved ones. He was deprived of the opportunity to work, to vote, and the fundamental freedom to live one's life as an autonomous human being.

78.     As a result of the foregoing, Mr. Walker has suffered severe emotional distress, exacerbation of existing mental illness, extreme anxiety, thoughts of suicide, and physical sickness and injury.

79.     Moreover, at the time of his conviction and incarceration, Mr. Walker was a college student on a full scholarship, studying computer science. He has suffered the loss of his scholarship as well the possibility of earning income from a career in information technology.

## Count I – 42 U.S.C. § 1983 Fourteenth Amendment

80.     Plaintiff incorporates all of the paragraphs of this Complaint as if fully restated herein.

81.     As set forth more fully above, the Defendant Officers and Investigators, acting individually, jointly, and in conspiracy, fabricated false reports and other evidence and/or withheld exculpatory evidence, including but not limited to:

> (1)     Fabricating evidence that no camera existed in the alley which could have recorded the encounter between Mr. Walker and the Defendant Officers;
>
> (2)     Fabricating false reports that drugs were found in Mr. Walker's possession on February 21, 2006; and
>
> (3)     Inventorying narcotics from another source and pretending they were Mr. Walker's.

82.     Absent the Defendant Officers and Investigators' misconduct, the prosecution of Plaintiff would not have been pursued, and Plaintiff would not have been convicted.

83.     The Defendants Officers and Investigators' misconduct directly and proximately resulted in the unjust and wrongful conviction of Plaintiff and his wrongful imprisonment, denying

15

him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

84.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and wantonly, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

85.     As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries including but not limited to loss of liberty, physical sickness and injury, and emotional distress.

86.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago of pursuing convictions in reckless disregard of the truth by using fabricated evidence.

87.     As a matter of both policy and practice, the City of Chicago directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its police officers, such that its failure to do so manifests deliberate indifference.

88.     Additionally, as a matter of both policy and practice, the City of Chicago facilitates the very type of misconduct at issue here by failing to adequately investigate, punish and discipline prior instances of similar misconduct, thereby leading police officers in the City of Chicago to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those that affected Plaintiff.

89.     Indeed, municipal policymakers have long been aware of the City of Chicago's policy and practice of failing to properly train, monitor, investigate and discipline misconduct by its police officers, but have failed to take actions to remedy the problem.  For example:

(a)      At a City Council hearing on September 28, 1999, in response to two high profile unjustified police shootings, Superintendent Terry Hillard noted the need for better in-service training on the use of force, early detection of potential problem officers, and officer accountability for the use of force.

(b)      In June 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

(c)      In 2001, the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed the findings of that resolution, concluding that the Chicago Police Department lacked many of the basic tools necessary to identify, monitor, punish and prevent police misconduct and brutality. The JCGC findings were presented to Mayor Daley, Superintendent Hillard, and the Chicago Police Board.

90.     Despite the municipal policymakers' knowledge of the City's failed policies and practices to adequately train, supervise, investigate, discipline, and control its police officers, nothing was done to remedy these problems.

91.     As a result, the Chicago Police Department has continued to respond to complaints of police misconduct inadequately and with undue delay, and to recommend discipline in a disproportionately small number of cases.

92.     Indeed, by its own admissions, over 99% of the time when a citizen complains that his or her civil rights were violated by police officers, the City of Chicago sides with the police officer and concludes that no violation occurred.

93.     For example, in 2005, at least 1,592 complaints of civil rights violations were lodged against Chicago Police Officers with the Police Department's Internal Affairs Division. A total of 5 were sustained, and that total may include cases arising in previous years.

*See:*
http://4abpn833c0nr1zvwp7447f2b.wpengine.netdna-cdn.com/wpcontent/uploads/2014/12/2005-Annual-Report.pdf at 41.

94. In other words, IAD sustained only 0.314% of the complaints that its police officers had committed civil rights violations in 2005.

95. In 2006, the number of civil rights complaints was 1,492. Twelve were sustained. *See* http://home.chicagopolice.org/wpcontent/uploads/2014/12/2006-Annual-Report.pdf at 62. Based on those numbers, IAD sustained only 0.8% of the civil rights complaints against Chicago police officers in 2006.

96. The same unconstitutionally lax oversight is evident across the multiple entities that have been responsible for investigating police misconduct. In 2006, for example, the Office of Professional Standards ("OPS"), which investigates complaints of excessive force, sustained only 57 out of 2,391 complaints excessive force by police officers, or 2%.

97. This trend continued throughout Mr. Walker's wrongful incarceration. In the most recently published annual report available on-line from the Independent Police Review Authority ("IPRA," the successor to OPS), IPRA reported that it sustained just under four percent of all complaints brought against officers for the 2011 to 2012 reporting period. *See* http://www.iprachicago.org/IPRA_AnnualReport2010-2012.pdf at page 31; Tables 1-3 (reporting that 105 complaints were sustained in the 2688 investigations that were closed during the annual cycle).

98. Even in the most extreme example of police shootings of Chicago residents, OPS exonerated CPD officers in over 99% of cases, regardless of the actual circumstances of the shooting.

99. The City of Chicago's investigation of citizen complaints is characterized by unreasonably long delays, despite the relative straight-forward nature of many misconduct claims.

100.     For example, one case in which an officer beat a man on his head with a baton, cracking his skull, was thrown out by the Police Board because IPRA failed to pursue charges before the five years statute of limitations had expired. In that case, the complainant had provided a statement and photographs of his injuries just days after the incident yet IPRA took more than five years to decide to pursue charges against the officer. *See* Annie Sweeney and Jeremy Gorner, *Police Misconduct Investigation Drags On For Years – Investigative agency's delays can lead to dismissal of charges*, Chicago Tribune, June 17, 2012.

101.     Although the City of Chicago has long been aware that its supervision, training, and discipline of police officers is entirely inadequate, it has not enacted any substantive measures to address that deficiency.

102.     Instead, Chicago continues to inadequately investigate citizen complaints. It has also failed to modify its officer training programs to reduce misconduct against Chicago residents or to implement a system to identify and track repeat offenders, districts, or units.

103.     City of Chicago policymakers have consistently maintained an attitude of deliberate indifference, ignoring these issues. At a City Council meeting regarding its oversight of police officers held on October 29, 2014, fewer than twelve council members were present and not one asked a single question about the City's performance investigating fatal shootings by officers or about the number of excessive force complaints the City has sustained. *See* Chip Mitchell, Aldermen skip chance to ask about city's handling of police commander, WBEZ (Oct. 29, 2014), available at http://www.wbez.org/news/aldermen-skip-chance-ask-about-citys-handlingpolice-commander-111016.

104.     The failure of the City's policies does not just stop with the investigating agencies. Even when investigators recommend some form of discipline, the Police Superintendent often overrides that recommendation.

105.     For example, in 2014, Police Commander Glen Evans of the Harrison District was accused of ramming his pistol down an arrestee's throat, the latest in a long line of allegations of abuse against Evans. IPRA recommended that Commander Evans be stripped of his police powers pending their investigation after finding DNA evidence of the victim on Evans's gun. Ignoring IPRA's recommendation, Police Superintendent Garry McCarthy and Mayor Rahm Emmanuel supported Evans and he remained in his leadership position as District Commander until he was criminally indicted in August 2014.

106.     Indeed, in 2012, Superintendent McCarthy promoted Evans to a leadership position in the Department despite the fact that over the course of his career there were over fifty citizen complaints filed against him. A report by the now deceased Chicago epidemiologist, Dr. Steve Whitman, found that Evan was ranked number one out of 1,541 officers he studied as having received the most complaints in his analysis of 13,527 excessive force complaints against Chicago Officers from 1998-2008. See Chip Mitchell, Report: Embattled commander No. 1 for excessive-force complaints, WBEZ (Aug. 5, 2014), available at http://www.wbez.org/news/reportembattled-commander-no-1-excessive-force-complaints-110605.

107.     In contrast, when investigators do not recommend any discipline, police supervisors agree with the investigators' determination one hundred percent of the time and never independently recommend disciplining an officer accused of violating citizens' civil rights.

108.     In the case of *Obryka v. City of Chicago et al.*, No. 07 cv 2372 (N.D. Ill.) (the Abbate case), a jury found that as of February 2007 "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

109.     The same constitutionally-defective oversight system in place in February 2007 was also in place on February 21, 2006, when Mr. Walker suffered the abuse described above.

110.     Indeed, the problem found to exist by the jury in *Obryka* continues to this day.  In December 2015, Mayor Rahm Emanuel acknowledged that a "code of silence" exists within the Chicago Police Department that encourages cover-ups of police misconduct, and that the City's attempts to deal with police abuse and corruption have never been adequate.

### Count II -  42 U.S.C. § 1983 - Failure to Intervene

111.     Plaintiff incorporates all of the paragraphs of this Complaint as if fully restated herein, except as to Defendant FINNELLY, who is not a party to Count II.

112.     As set forth more fully above, the Defendant Officers and Investigators had a reasonable opportunity to intervene to prevent the deprivation of Mr. Walker's constitutional rights, but failed to do so.

113.     In failing to intervene, the Defendant Officers and Investigators violated their clearly established constitutional duty to report all material exculpatory and impeachment information to prosecutors.

114.     Absent Defendants' misconduct, the prosecution of Plaintiff would not have been pursued, and Plaintiff would not have been convicted.

115.     Defendants' misconduct directly and proximately resulted in the unjust and wrongful conviction of Plaintiff and his wrongful imprisonment, denying him his constitutional

right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

116.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and wantonly, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

117.    As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries including but not limited to loss of liberty, physical sickness and injury, and emotional distress.

118.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago of pursuing convictions in reckless disregard of the truth by using fabricated evidence and withholding material exculpatory and impeachment as described in paragraphs 84-105 of this Complaint.

### Count III – 42 U.S.C. § 1983 Conspiracy

119.    Plaintiff incorporates all of the paragraphs of this Complaint as if fully restated herein.

120.    As set forth more fully above, the Defendant Officers and Investigators agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights under the Fourth and Fourteenth Amendments, all as described in the various paragraphs of this Complaint.

121.    Additionally, before and after Plaintiff's conviction, the Defendant Officers and Investigators further conspired, and continue to conspire, to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being

charged, his being acquitted, or his more timely exoneration. Each Defendant shared in the objective of depriving Plaintiff of his constitutional rights in this way.

122.    In this manner, Defendants Officers and Investigators, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

123.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above – such as fabricating evidence and withholding exculpatory evidence – and was an otherwise willful participant in joint activity.

124.    As a direct and proximate result of the illicit prior agreements and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he sustained injuries, including loss of liberty, physical injury and sickness, and emotional pain and suffering, as is more fully alleged above.

125.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and wantonly, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

126.    Absent Defendants' misconduct, the prosecution of Plaintiff would not have been pursued, and Plaintiff would not have been convicted.

127.    Defendants' misconduct directly and proximately resulted in the unjust and wrongful prosecution and conviction of Plaintiff and his wrongful imprisonment, denying him his constitutional right to a fair trial, in violation of the Fourth Amendment and/or the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

128.     As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries including but not limited to loss of liberty, physical sickness and injury, and emotional distress.

129.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago of pursuing convictions in reckless disregard of the truth by using fabricated evidence and withholding material exculpatory and impeachment evidence, as described in paragraphs 84-105 of this Complaint.

### Count IV – 42 U.S.C. § 1983 Fourth Amendment

130.     Plaintiff incorporates all of the paragraphs of this Complaint as if fully restated herein.

131.     On February 21, 2006, Mr. Walker was detained and arrested without probable cause by Defendant Officers.

132.     On February 21, 2006 Mr. Walker was confined to jail after his arrest without probable cause.

133.     Mr. Walker remained in custody until his conviction on June 2, 2006, without probable cause.

134.     On March 25, 2016, the proceeding was resolved in Mr. Walker's favor when the indictment against him was dismissed.

135.     The Defendant Officers at no time prior to Mr. Walker's arrest had any probable cause, nor even reasonable suspicion to detain Mr. Walker.

136.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and wantonly, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

137.     As a direct and proximate result of the legal proceeding maliciously instituted by the Defendant Officers and Investigators, Plaintiff suffered damages, including loss of liberty, physical injury and sickness, and emotional pain and suffering, as is more fully alleged above.

## Count V – State Law Malicious Prosecution

138.     Plaintiff incorporates all of the paragraphs of this Complaint as if fully restated herein.

139.     As described more fully above, the Defendant Officers and Investigators maliciously and without any reasonable ground of suspicion, and unsupported by circumstances sufficiently strong in themselves to warrant a cautious person in the belief that Mr. Walker was guilty of the offense, instituted prosecution against him.

140.     The proceeding was resolved in Mr. Walker's favor when the indictment against him was dismissed on March 25, 2016.

141.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and wantonly, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

142.     As a direct and proximate result of the legal proceeding maliciously instituted by Defendant Officers and Investigators, Plaintiff suffered damages, including loss of liberty, physical injury and sickness, and emotional pain and suffering, as is more fully alleged above.

## Count VI - Illinois State Law Conspiracy

143.     Plaintiff incorporates all of the paragraphs of this Complaint as if fully restated herein.

144.     As described more fully in the preceding paragraphs, the Defendant Officers and Investigators entered into an agreement among themselves to participate in an unlawful act or act

in an unlawful manner toward Plaintiff, including by conspiring to deprive Mr. Walker of his constitutional rights.

146. Each of the Defendant Officers and Investigators was a willing participant in and committed one or more overt acts to further their common scheme of acting in an unlawful manner toward Plaintiff.

146. As a proximate result of this conspiracy, Plaintiff suffered damages, including but not limited to physical sickness and injury and emotional distress.

147. The misconduct described in this Count was undertaken by Defendant Officers and Investigators within the scope of their employment and under color of law such that their employers, the City of Chicago and Anita Alvarez, in her official capacity as Cook County State's Attorney, are liable for their actions.

**Count VII – State Law Intentional Infliction of Emotional Distress**

148. Plaintiff incorporates all of the paragraphs of this Complaint as if fully restated herein.

149. In the manner described more fully above, by depriving Mr. Walker of his right to a fair trial and by maliciously prosecuting him, the Defendant Officers and Investigators engaged in extreme and outrageous conduct.

150. In carrying out the actions described above, Defendant Officers and Investigators either intended to inflict or knew that there was a high probability that their conduct would cause severe emotional distress.

151. These Defendants' actions were willful and wanton, undertaken with malice and reckless indifference to the rights of others.

152.     The misconduct described in this Count was undertaken by Defendant Officers and Investigators within the scope of their employment such that their employers, the City of Chicago and Anita Alvarez, in her official capacity as Cook County State's Attorney, are liable for their actions.

153.     As a direct and proximate result of misconduct, Mr. Walker suffered injuries including but not limited to severe emotional distress.

### Count VIII - State Law Respondeat Superior

154.     Plaintiff incorporates all of the paragraphs of this Complaint as if fully restated herein.

155.     In committing the acts alleged in the preceding paragraphs, the Defendant Officers were employees and agents of the City of Chicago and the Chicago Police Department acting at all relevant times within the scope of their employment.

156.     Defendant the City of Chicago is liable as principal for all torts committed by its agents.

### Count IX – State Law Indemnification

157.     Plaintiff incorporates all of the paragraphs of this Complaint as if fully restated herein.

158.     Illinois law requires public entities to pay any tort judgment for compensatory damages against an employee acting within the scope of his or her employment.  Illinois law also requires that Cook County pay any tort judgment for compensatory damages against a state employee where the County funds the state office that employs the tortfeasor. The Cook County State's Attorney's Office is funded by Defendant Cook County.

159.    The Defendant Officers and Investigators are or were employees of the City of Chicago and the Cook County State's Attorney's Office, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE Plaintiff, Jermaine Walker, respectfully requests that this Court enter judgment in his favor and against Defendants MICHAEL WHITE, ERIC REYES, SEBASTIAN FLATLEY, BRIAN DALY, RAUL BAEZA, THOMAS GAYNOR, the CITY OF CHICAGO, THOMAS FINNELLY, COOK COUNTY, ILLINOIS, and UNIDENTIFIED CHICAGO POLICE OFFICERS AND COOK COUNTY STATE'S ATTORNEY INVESTIGATORS, awarding compensatory damages, costs, and attorneys' fees against each Defendant, along with punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, JERMAINE WALKER, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


Respectfully Submitted,


/s/ Michael C. Terranova
One of the Attorneys for Plaintiff

Michael P. Cogan, Esq.
Michael C. Terranova, Esq.
**COGAN & POWER, P.C.**
One East Wacker Drive, Suite 510
Chicago, Illinois 60601
(312) 477-2500
(312) 477-2501 (Fax)