### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JERMAINE WALKER,

        Plaintiff,

    v.

MICHAEL WHITE et al.,

        Defendants.

No. 16 CV 7024

Judge Manish S. Shah

### MEMORANDUM OPINION AND ORDER

Plaintiff Jermaine Walker alleges that a group of Chicago police officers framed him for drug crimes, resulting in his conviction and a 22-year prison sentence. Throughout the state-court proceedings, Walker insisted that a security camera in the alley where he was arrested would expose the officers' misconduct and exonerate him. Before trial, a Cook County investigator took photographs of the alley, and the prosecutor introduced them at trial. None of the photographs showed a camera, and the investigator and two CPD officers testified at trial that there was no camera in the alley. Years later, a reinvestigation revealed that there had been a camera in the alley when Walker was arrested. The state moved to vacate Walker's conviction and sentence, and he received a certificate of innocence. Walker brings claims for fabrication of evidence, unlawful pretrial detention, and malicious prosecution, among others, against the CPD officers, the investigator, Cook County, and the City of Chicago. The defendants move for partial summary judgment. For the reasons that follow, their motions are granted in part, denied in part.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I construe all facts and draw all inferences in favor of the nonmoving party. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 377–78 (7th Cir. 2020). I need only consider the cited materials, but I may consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.    Background

Defendants Michael White, Eric Reyes, Sebastian Flatley, Brian Daly, Raul Baeza, and Thomas Gaynor were Chicago police officers. [285] ¶ 2.[1] Defendant Thomas Finnelly was an investigator for the Cook County State's Attorney's Office. [285] ¶ 3.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Walker's response to defendants' joint Local Rule 56.1 statement, [285], and defendants' response to Walker's statement of additional facts, [294], where both the asserted fact and the opposing party's response are set forth in one document. Any fact not properly controverted is admitted, with one significant exception discussed below. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statements of facts, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006), and ignore additional facts included in response to the asserted fact that do not controvert the asserted fact. N.D. Ill. Local R. 56.1(e)(2).

On February 21, 2006, Walker, a student at Fisk University in Tennessee, and his brother, Russell Walker,[2] stopped at JJ Peppers before going to their sister's apartment. [294] ¶¶ 1–3.[3] Jermaine Walker was in the driver's seat of the car and Russell was in the passenger seat. [285] ¶ 9. Both brothers had been smoking marijuana in the car that day, and there was marijuana in the ashtray of the car. [285] ¶¶ 10, 29.

Reyes, Flatley, Daly, and White were on patrol in a police car, with Reyes driving. [285] ¶ 6. The parties dispute what happened next. According to the officers, around 8:30 p.m., a citizen stopped them and told them that two African-American men in a white car with Tennessee license plates were selling drugs near Lawrence Avenue and Sheridan Road. [285] ¶ 7. The officers saw a car matching that description in the parking lot of JJ Peppers. [285] ¶ 8. According to White, a man later identified as Dewey Brown was standing outside the car talking to Russell, and Russell pointed westbound. [285] ¶ 11. The Walkers then left the parking lot, driving west, and turned into an alley between a hotel, the Lawrence House, and JJ Peppers, while Brown walked into the alley. [285] ¶ 12–13. The Walkers parked near the south

---

[2] For ease of reading, I refer to plaintiff Jermaine Walker as Walker, and his brother Russell Walker as Russell.

[3] The city defendants' request to strike some of Walker's additional facts is denied. [296] at 7. Motions to strike are generally disfavored. N.D. Ill. Local R. 56.1(e)(2). *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989) (motions to strike "serve only to delay"). And they are particularly unnecessary on summary judgment because the court must always review statements of material facts and "eliminate from consideration any argument, conclusions, and assertions" that are unsupported by the record. *Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F.Supp.3d 917, 921 (N.D. Ill. 2014). I disregard arguments and legal conclusions in the Rule 56.1 statements, so a motion to strike is unnecessary.

end of the alley. [285] ¶ 12. The officers followed in their car, and, once in the alley, White and Reyes saw Brown hand Russell money through the passenger side window of the car in exchange for a small object. [284] ¶¶ 14–15; [278-6] at 116:15–24; [278-15] at 11–12. Flatley saw Brown point to the item in his hand. [285] ¶ 16.

According to Walker, Brown was never in the parking lot of the JJ Peppers, and neither he nor his brother ever spoke to Brown. [285] ¶¶ 11–13; [294] ¶ 5. Walker pulled out of the JJ Peppers parking lot, and the officers activated their police lights. [285] ¶ 14; [294] ¶ 4. In response, Walker pulled into the alley and stopped the car. [285] ¶ 14; [294] ¶ 4. Walker saw Brown talking to another person in the alley, and that person ran away. [285] ¶ 15; [294] ¶ 6.

The parties agree that Brown fled toward the north end of the alley when the officers got out of their car, and that Flatley chased Brown and stopped him at the end of the alley. [285] ¶¶ 17–20. Brown had a small plastic bag containing a rock of crack cocaine, and Flatley handcuffed him and walked him back to the police car at the south end of the alley. [285] ¶ 20. When Brown fled, Daly got back in the police car to follow him; once Flatley radioed that he had Brown in custody, Daly got out of the car and saw Flatley escorting Brown down the alley. [285] ¶ 21.

While Flatley and Daly chased Brown, White and Reyes approached the Walker brothers' car. [285] ¶¶ 22–25; [294] ¶ 7. The parties dispute what happened next. According to Reyes, Walker threw a bag of what appeared to be cocaine out the window as the officers approached. [285] ¶ 26. Reyes asked Walker to get out of the car, then patted Walker down and handcuffed him, while White did the same to

Russell. [285] ¶¶ 24, 27. White found cocaine on the front passenger seat of the car. [285] ¶ 24.

According to Walker, there was no cocaine in the car, and he did not throw any drugs out the window. [285] ¶¶ 24, 26; [294] ¶¶ 15, 17–19. Likewise, Russell didn't have drugs on him and never sold Brown drugs. [285] ¶ 15. As Walker remembers it, Reyes approached the car with his gun drawn and asked Walker for his identification. [285] ¶ 27; [294] ¶ 7. Walker complied and asked Reyes why the officers had stopped him. [294] ¶ 7. Reyes didn't answer, and ordered Walker out of the car, but Walker refused and asked to speak to a sergeant [285] ¶ 27; [294] ¶ 7. White came to the door a few minutes later and asked Walker to step out of the car, which he did. [285] ¶ 27; [294] ¶ 8. Reyes searched and handcuffed Walker, then Reyes began to beat him. [285] ¶ 27; [294] ¶¶ 9–10. Walker told the officers that their actions were on "candid camera." [285] ¶ 27; [294] ¶ 9. The officers deny beating Walker and dispute that Walker ever said anything about a camera. [294] ¶ 9.

Gaynor and Baeza arrived at the north end of the alley in response to Flatley's radio report of a chase. [285] ¶ 30. By the time Gaynor and Baeza arrived, Brown and the Walker brothers were already detained and handcuffed. [285] ¶¶ 30–31. Neither Gaynor nor Baeza interacted with either Walker brother in the alley. [285] ¶ 31.

At the police station, Flatley searched Walker and found cocaine in Walker's sock; Walker denies that Flatley found drugs on him. [285] ¶¶ 32–33, 96; [294] ¶ 15, 17–19. Reyes wrote the case report describing Walker's arrest. [285] ¶ 34. Daly did

not write a report and did not communicate with either Walker brother or with Brown. [285] ¶ 35.

On March 15, 2006, a grand jury indicted the Walker brothers together on four charges: possession of a controlled substance with intent to deliver within 1,000 feet of a school, possession of a controlled substance with intent to deliver, delivery of a controlled substance within 1,000 feet of a school, and delivery of a controlled substance. [285] ¶¶ 36–38; [294] ¶ 16. The indictment only charged the brothers with possessing and delivering cocaine, not marijuana. [278-16] at 1–6. Russell pleaded guilty to possession of cocaine with intent to deliver and possession within 1,000 feet of a school. [285] ¶ 38. In the same indictment, the grand jury charged Brown with, and he later pleaded guilty to, possession of a controlled substance, based on the baggie of crack cocaine found on him in the alley. [285] ¶¶ 39–40. He was sentenced to two years of mental-health probation, and admitted that he committed that crime. [285] ¶ 40.

Walker opted for a trial and chose to represent himself. [285] ¶ 60. In April 2006, in preparation for Walker's trial, an Assistant State's Attorney requested that an investigator photograph the alley, measure to find out if any drug sale occurred within 1,000 feet of a school, and see if there was a camera in the alley. [285] ¶ 42. Finnelly was assigned to that request. [285] ¶ 43; [294] ¶ 22. Walker asked the trial court to appoint him his own defense investigator to investigate whether there was a camera in the alley, but the court denied his request. [285] ¶ 83; [294] ¶ 21.

6

Twice, once in late April and once in early May, Finnelly took pictures of the alley. [285] ¶¶ 43–46; [294] ¶ 22. He walked north and south through the alley, but focused on the back of the JJ Peppers because that's where he thought the drug deal had occurred. [285] ¶ 44; [278-3] at 48:7–8, 57:2–7, 78:3–5, 82:2:11. Finnelly looked for a camera, but says he did not see one in the alley. [285] ¶¶ 45–46.

Whether Finnelly saw a camera is important. If he did not see one, then Walker's case against him falls apart because the gravamen of the claim is that Finnelly concealed a camera he knew was there. And if Finnelly's testimony is undisputed, then no jury could find that he violated Walker's rights. Walker tries to dispute Finnelly's testimony but does not follow our court's procedures to do so. He cites to his own statement of facts, rather than evidence in the record. [285] ¶ 46; *see* N.D. Ill. L.R. 56.1(e)(3). Worse, he cites to additional facts 69, 70, 71, and 74 to controvert the statement. [285] ¶¶ 45–47. Those facts don't exist—Walker's statement of additional facts ends at fact 46. [294]. District courts are entitled to "require strict compliance with local summary-judgment rules." *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 790 (7th Cir. 2019). Courts are not required to scour the record looking for factual disputes. I could deem Finnelly's statement undisputed and end the case against him.

Walker's failure to follow the rules is surprising because there is evidence in the record from which a jury could find that Finnelly saw the camera. It is undisputed that Finnelly went to the alley twice and walked up and down looking for a camera. There is evidence that the camera was there. [285] ¶ 43–46, 89; [294] ¶ 32; [286-8];

[286-9]; [278-3] at 48:7–8, 57:2–7, 78:3–5, 82:2:11.[4] Taken together, there's sufficient circumstantial evidence from which a jury could discredit Finnelly's testimony and instead infer that Finnelly must have seen the camera. Of course, a jury could also credit Finnelly's testimony. There is corroborating evidence in the record: Walker's posttrial investigator didn't see the camera and neither did his brother. [285] ¶¶ 51, 80. Because the record reveals a factual issue over what Finnelly saw, I treat defendants' asserted fact as disputed notwithstanding Walker's failure to comply with the local rule. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (district courts have discretion to strictly apply local rules or "overlook any transgression" (quoting *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995))).

At trial, Finnelly, Reyes, Flatley, and White testified. [285] ¶¶ 62–63. Finnelly testified that he took photographs of the alley on two separate occasions. [285] ¶ 63. Finnelly took seven photographs that were admitted into evidence; five of them depicted the alley. [285] ¶¶ 64–65. The pictures showed the alley behind JJ Peppers, the back of JJ Peppers, a view of the alley facing southbound, a phone pole in the alley with wires, and the side of a building with cables in the alley facing southbound. [285] ¶ 66. None of the photos showed a camera. [285] ¶ 66. When the prosecutor asked if the photos truly and accurately depicted "the way the scene appeared and

---

[4] The parties dispute whether there was a video camera in the alley in February 2006. Defendants concede that there was a camera attached to the Lawrence House at some point, but say the camera wasn't there in 2006, based on testimony from Finnelly and Walker's posttrial investigator. [285] ¶ 58; [294] ¶ 12. The parties also dispute whether the camera was capable of recording, but that dispute is immaterial—regardless of the camera's capability, there's no evidence that Walker's arrest was recorded.

the walls of the alley," Finnelly answered yes. [285] ¶ 67; [278-22] at 12. On cross-examination, Finnelly again testified that there was no camera in the alley. [278-22] at 14, 18. Walker pressed Finnelly on why he had only taken close-up shots of the building on one side of the alley, and Finnelly responded, "Because there's no cameras." [278-22] at 18.

While cross-examining Reyes, Walker stated that a camera at the scene would prove his innocence, and asked Reyes four times if he knew about the camera on the Lawrence House. [285] ¶¶ 68–69. Reyes said he was not aware of a camera. [285] ¶ 69. Walker also cross-examined Flatley, and asked him if there was a camera in the alley; Flatley said he didn't think so. [285] ¶ 70. Walker didn't ask White about the camera. [285] ¶ 71. An Illinois State Police forensic scientist also testified; he identified the drugs the state introduced as cocaine. [285] ¶ 72.[5]

Walker didn't present evidence on his behalf. [285] ¶ 73. During closing argument, he argued that the officers had fabricated evidence against him, and that the arrest had been caught on the camera, which Finnelly had refused to photograph. [285] ¶ 76; [294] ¶ 25. During the state's closing argument, the ASA argued that there was "absolutely no evidence" that a camera existed in the alley, based on "[w]itness after witness after witness" telling the jury there was no camera, and the pictures of

---

[5] The state introduced four exhibits containing cocaine at the trial against Walker: the packet of cocaine Flatley recovered from Dewey Brown; two packages from the passenger seat of the car; the 19 bags that Walker allegedly tossed out the window; and two chunks of cocaine found in Walker's sock. [278-27] at 22–23, 26. Flatley inventoried all four exhibits, and he identified them at trial. [278-27] at 22–23, 26. The forensic scientist identified the four exhibits and testified that they had tested positive for cocaine. *See* [278-29]. White also identified the packets of cocaine he had recovered from the passenger seat of Walker's car at trial. [278-15] at 12, 15–16.

the alley. [294] ¶ 27. She added, "If there was a camera, do you think this defendant and his brother would be stupid enough to deal drugs in front of it? Come on. Don't you think that they would pick another alley? Get real." [294] ¶ 27. Walker was convicted of possession of a controlled substance with intent to deliver within 1,000 feet of a school, and possession with intent to deliver more than five grams. [285] ¶¶ 5, 77.

Walker received a court-appointed public defender for posttrial motions and sentencing. [285] ¶ 79. His lawyer sent an investigator to the alley to examine it for a camera. [285] ¶ 79. She looked for a camera at the mouth of the alley by the Lawrence House, but didn't see one. [285] ¶ 80. The trial judge sentenced Walker to 22 years in state prison. [285] ¶ 78.

On appeal, Walker argued that the trial court erred when it refused his request for an investigator. [285] ¶ 83. The appellate court affirmed the conviction, reasoning that the camera would only have been crucial to Walker's case if Walker's arrest had been recorded, the footage was preserved, and the footage contradicted the officers' account. [285] ¶ 84.

In 2010, an investigator with the public defender's office obtained two affidavits from employees of the Lawrence House. [285] ¶ 89; [294] ¶ 32; [286-8]; [286-9]; [278-33] at 11; [278-25] at 41:18–43:4. The employees affirmed that, in February 2006, there was a closed-circuit camera at the mouth of the alley providing live footage to a monitor at the front desk of the Lawrence House. [294] ¶¶ 12–14; [286-8]; [286-9].

In 2015, Walker filed his second postconviction petition and attached the two 2010 affidavits from the Lawrence House employees. [285] ¶ 86; [294] ¶ 32.[6] In his petition, Walker argued that Finnelly and the officers had perjured themselves at trial when they denied there was a camera in the alley. [285] ¶ 89; [294] ¶ 32.

The State's Attorney's Office reopened and investigated Walker's case. [285] ¶ 90. The owner of the Lawrence House confirmed that there had been a camera on the back of the building in 2006. [285] ¶ 91. In March 2016, the state moved to vacate Walker's conviction and sentence and nolle pros (abandon) the case. [285] ¶¶ 91–92; [294] ¶ 33. The state asserted that the pictures had depicted a different part of the alley than where Walker said the camera was, and that the appellate court had based its holding about denying Walker an investigator in part on the trial evidence that no camera existed. [285] ¶ 92. The judge who presided over Walker's trial granted the motion to vacate, noting that the officers testifying at trial had sworn to tell the truth, but had testified to something untrue. [294] ¶ 34. She added that, "everybody in the court system was relying on the information and the photographs that were sworn to as truth." [294] ¶ 34.[7] Walker served almost 11 years of the 22-year sentence. [285] ¶ 93.

---

[6] Defendants object to Walker's postconviction petition as hearsay, but defendants offered the fact that Walker had filed an amended postconviction petition in their own statement of facts, and attached the petition as an exhibit. *See* [285] ¶ 86. The fact is therefore undisputed and it's admitted.

[7] The judge's comments are admitted for purposes of summary judgment over defendants' objection, not for their truth or for the judge's assessment of the officers' credibility, but for the limited purpose of ascertaining whether Walker's conviction was terminated in a manner indicative of his innocence. *See, e.g.*, *Washington v. Summerville*, 127 F.3d 552, 558 (7th Cir.

In 2016, Walker filed a petition for a certificate of innocence under 735 ILCS § 5/2-702. At the hearing, the State's Attorney's Office took no position on Walker's guilt or innocence. [294-6] at 5. The ASA asserted that vacating the conviction was the "right thing to do" and a "fair resolution of the matter" because Walker had not been able to present his defense as trial. [294] ¶ 41; [294-6] at 4. The judge said that he was struggling with whether Walker had met his burden. [294-6] at 9. The judge found that, based on Walker's "insistence that he's innocent," the officers "either testifying mistakenly or testifying falsely on purpose" about the camera "inure[d] to Mr. Walker's benefit." [294-6] at 10. He entered an order granting Walker a certificate of innocence. [294] ¶ 42.

CPD officers typically didn't communicate with the State's Attorney's Office about investigations; once the officers processed an arrest and gave it to the State's Attorney's Office, it was out of the officers' hands and the officers were not involved from that point on. [285] ¶ 48.[8] The officers and Finnelly have never spoken to each other, including about the investigation of Walker's case. [285] ¶¶ 4, 50.[9]

---

1997) (considering "state court transcripts" on summary judgment in assessing whether plaintiff's case was nolle prossed in a manner indicative of innocence).

[8] The fact is admitted over Walker's objection. He asserts that Finnelly would have known from the ASA's investigator report form which officers were involved in the case. But that's not responsive to the asserted fact—Finnelly's knowledge of which officers were involved in the arrest has nothing to do with whether the officers participated in the investigation once they handed it off to the State's Attorney's Office.

[9] Walker denies this fact because Finnelly was a CPD officer before joining the State's Attorney's Office. [285] ¶ 4. Walker's fact is unresponsive to defendants' asserted fact, and doesn't refute the defendants' testimony that none of the officers had ever met Finnelly. The fact is admitted.

12

Walker sues White, Reyes, Flatley, Daly, Baeza, Gaynor, Finnelly, the City of Chicago, Cook County, and unidentified Chicago police officers. He brings seven claims against the individual defendants: evidence fabrication under the Fourteenth Amendment for planting the drugs and fabricating photographs of the alley (count I); failure to intervene (count II); conspiracy under 42 U.S.C. § 1983 (count III); unlawful detention in violation of the Fourth Amendment (count IV); malicious prosecution (count V); state-law conspiracy (count VI); and intentional infliction of emotional distress (count VII). Finnelly is not named in the failure-to-intervene claim.[10] Walker also brings claims of state-law respondeat superior against the City (count VIII); indemnification against the City and Cook County (count IX); and a *Monell* claim against the City. [285] ¶ 94. The *Monell* claim was bifurcated for discovery. [98].

Finnelly and Cook County move for summary judgment on all claims against them. The officers and the City move for partial summary judgment on the fabrication claim as it pertains to the photographs—not the allegedly planted drugs—as to all defendants, and to the drug-fabrication claim as to Daly, Baeza, and Gaynor; the failure-to-intervene claim as to Daly, Gaynor, and Baeza; the Fourth Amendment, malicious-prosecution, and conspiracy claims as to all defendants; the intentional infliction of emotional distress claim as to White, Daly, Baeza, and Gaynor, and the

---

[10] To the extent Walker argues in his brief that the defendants committed a *Brady* violation, that claim has been dismissed. [99].

derivative claims to the extent summary judgment is granted on the underlying claims.[11]

## III. Analysis

### A. Fabrication of Evidence

Using false evidence to convict someone at trial deprives that person of his due-process right to a fair trial under the Fourteenth Amendment. *Patrick v. City of Chicago*, 974 F.3d 824, 834–35 (7th Cir. 2020); *Coleman v. City of Peoria*, 925 F.3d 336, 344 (7th Cir. 2019). The "essence" of a due-process fabrication claim is that "the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process." *Patrick*, 974 F.3d at 835.

To establish this kind of due-process violation, a plaintiff must show that the defendants created evidence that they knew to be false. *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019); *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014). Further, the plaintiff must show that the evidence was used in some way to deprive him of his liberty. *Anderson*, 932 F.3d at 510.

To be liable for any claim under § 1983, a defendant must be "personally responsible" for the alleged deprivation of the plaintiff's constitutional rights. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018); *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015). No reasonable jury could find that any of the CPD officers

---

[11] The city defendants also move for summary judgment against any unnamed Chicago police officers, and Walker agrees. [284] at 41. All unnamed officers are dismissed as defendants.

participated in creating the photographs. Walker identifies no evidence that they collaborated with Finnelly before he went to the alley. The officers and Finnelly didn't know each other and had never spoken at all, let alone about Walker's case. Once the officers handed the case over to the State's Attorney's Office, the officers weren't involved in the case and would have had no occasion to talk to Finnelly. And although two officers testified that they didn't notice a camera at trial, witnesses are immune from suit under § 1983 solely for their trial testimony. *Rehberg v. Paulk*, 566 U.S. 356, 367 (2012) ("[A] trial witness has absolute immunity with respect to *any* claim based on the witness' testimony."); *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017) ("trial testimony, standing alone" could not subject officers to damages liability). This rule applies equally to law-enforcement witnesses. *Rehberg*, 566 U.S. at 369. Since the officers cannot be liable for their testimony alone, and no evidence suggests they were involved in creating the photographs, summary judgment is granted to all CPD officers on the claim of fabricating the photographs.

Turning to Finnelly's liability, there is a dispute of fact about whether a camera existed in the alley in February 2006. Neither Finnelly nor a defense investigator saw one in 2006. A jury could credit that testimony. But two Lawrence House employees signed affidavits in 2010 verifying that a camera had been in the alley in February 2006. The State's Attorney's Office reinvestigated the case years later, confirming with the owner of the Lawrence House that the camera had been there. A reasonable jury could find that a camera existed in 2006.

There is a genuine dispute about whether the photos were fabricated. Fabricated testimony is testimony that is "made up; it is invariably false." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). Courts have drawn a line between evidence that was obtained dishonestly (e.g., paying witnesses for testimony or coaxing a reluctant witness) and evidence that is fully fabricated. That's because evidence collected by coercive techniques isn't necessarily untrue. *Coleman*, 925 F.3d at 346. For Walker to win on his fabricated-evidence claim, he must show that the evidence was actually untrue.

The photos themselves weren't doctored or altered; there's no dispute that they accurately displayed parts of the alley. A jury might find that the photos spoke for themselves—five photos couldn't reasonably be expected to display every detail of a multi-block alley, and anyone would know that if Finnelly had been standing in a different spot, a different part of the alley would have appeared in the photographs. A photo of one wall of the alley obviously only shows that wall. The probative value of the photographs depended on the scope of the area they represented. That they were incomplete or even strategically selective doesn't mean they were made up.

But a jury could also find that the photos, though not altered, were taken and presented in such a misleading way as to be fabricated. As noted, witnesses at a criminal trial are immune from suit for their testimony alone. *Avery*, 847 F.3d at 441. But "virtually any item of evidence introduced at trial must be authenticated by oral testimony." *Id*. The due-process violation is not complete until the officer authenticates and introduces the fabricated evidence at trial. *Id*. So although an

officer is immune from liability for his testimony alone, he is not immune from testimony that repeats or authenticates the content of the fabricated evidence. *Id.*

At trial, Finnelly described photographing the alley "from the south to the north and from the north to the south." [278-22] at 6–7. When the prosecutor asked if the photos accurately depicted "the way the scene appeared and the walls of the alley," Finnelly answered yes. [278-22] at 12. In the course of laying foundation for Finnelly's photos, the prosecutor asked him three times if he saw a camera in the alley while photographing it; each time, Finnelly said no. [278-22] at 7, 8, 13. So the prosecution introduced the photographs as a fair and accurate representation of the alley in full, without a camera. A reasonable jury could find the photos to be such a distortion of the truth that they were effectively false. They were a device used to convey a false statement: that there was no camera in the alley. It's rare, but not unprecedented, to treat evidence containing egregious omissions as fabricated. For example, where a police report omitted "the most important details," the court of appeals treated that report the same way it treated other fabricated evidence. *Hurt v. Wise*, 880 F.3d 831, 837 (7th Cir. 2018), *overruled on other grounds by Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019); *see also Hyung Seok Koh v. Graf*, 307 F.Supp.3d 827, 858 (N.D. Ill. 2018) ("there must be some point where omissions become egregious enough" to render an item of evidence "effectively false"). A jury would not be required to find that the photos amounted to a false presentation, but there are enough disputes about the factual context to preclude judgment as a matter of law on the issue of falsity.

There's also a genuine dispute about whether Finnelly knowingly created false evidence. A jury could credit Finnelly's assertion that he looked for a camera and didn't see one, and attribute it to a good-faith oversight. Walker's own investigator didn't find the camera, suggesting it may not have been as obviously visible in 2006 as Walker suggests. Walker's brother didn't notice a camera either. There's also evidence that Finnelly had the wrong information about where the drug deal occurred, so he looked for the camera behind the JJ Peppers instead of attached to the hotel. On this record, Finnelly had little motive to frame Walker and never collaborated with the police officers. And the record is unclear about whether Finnelly knew that it was Walker, not the state, who would benefit from his photographing the camera. *See* [285] ¶¶ 43–44; [278-3] at 34:15–21, 42:7–46:7 (Finnelly initially said he didn't know about Walker's claim that a camera would exonerate him, then said he couldn't remember if he had talked to anyone from the State's Attorney's Office or CPD about Walker's claim). If Finnelly thought the presence of a camera would help the state's case, not Walker's, he couldn't have knowingly created false evidence to injure Walker.

On the other hand, Finnelly knew that part of his assignment was to look for a camera, and he went to the alley two separate times to do so. Even if he had the wrong address where the deal occurred, Finnelly repeatedly testified that he walked up and down the alley looking for a camera. A jury could find that he couldn't possibly have missed it, so its omission from his photographs must have been intentional. And a reasonable factfinder might find it too convenient of a coincidence that although

18

Finnelly took multiple photos of the alley from different angles—five were introduced at trial—not one even inadvertently captured the one thing that Walker insisted would help his case. Given the ambiguity in the record about what Finnelly knew and when, it will be up to the jury to assess Finnelly's credibility and decide whether he knowingly created inaccurate photographs or simply made a mistake.

Walker must also prove a "reasonable likelihood" that the fabricated evidence "affected the judgment of the jury." *Patrick*, 974 F.3d at 835. Walker is wrong that he can establish a due-process violation without proving that the evidence prejudiced him in some way—the evidence must have caused the deprivation of liberty. If the fabricated evidence was "immaterial, it cannot be said to have caused an unconstitutional conviction and deprivation of liberty." *Id*.

The prosecution called five witnesses: Reyes, Flatley, White, Finnelly, and the forensic scientist who identified the drug evidence. It introduced four cocaine exhibits and seven photographs, five of which depicted the alley. The bulk of the prosecution's case was the physical evidence and the officers' testimony that they saw Brown and Russell exchange cocaine for money, saw Walker try to discard 19 packets of cocaine, and recovered cocaine from the car, Walker's sock, the ground, and Brown. The prosecution relied on the photographs to set the scene, asking Reyes to mark up one of the photographs—Reyes identified the locations of Walker's car in the alley, the officers' car, where the officers saw Brown, and where Walker's drugs landed after he tossed them. [278-13] at 28–30. The ASA didn't show any of the photographs to White or Flatley. [278-15]; [278-28]. The prosecutor also used the photos to establish that

there was no camera in the alley. While laying the foundation for the photos, she asked Finnelly three times whether he saw a camera while photographing the alley. [278-22] at 7, 8, 13. On redirect of Reyes, the ASA showed him each photo of the alley, and asked whether each photo contained a camera. [278-13] at 60–63. And in her closing argument, the ASA referenced the photographs to emphasize that there was no camera in the alley: "You have pictures of the alley, including closeups that show you there is no camera." [286-11] at 9.

There's a genuine dispute about whether the photographs' omission of the camera could have affected the verdict in Walker's criminal trial. The photographs were the only evidence the prosecution gave the jury to visualize what occurred. The prosecution relied on the photographs to advance its theory that there was no camera in the alley and to corroborate testimony about the absence of a camera. And they were uncontradicted—Walker was denied an investigator before trial and didn't present his own evidence. Two witnesses, Reyes and Finnelly, testified that the photographs showed no camera. The ASA referenced the photos in her closing argument to emphasize that there was no camera in the alley. Walker tried to make the trial about the camera; he cross-examined three witnesses about it and mentioned in his closing argument that his arrest was "caught on camera." [278-31] at 5–6. Defendants make much of the fact that the camera didn't record, so without footage, the photographs of the alley couldn't have influenced the verdict. The question isn't whether a recording would have affected the verdict, but whether there's a reasonable likelihood that the photographs themselves (and the arguably false impression they

conveyed) did. Given the prosecution's use of the photographs to prove that there was no camera in the alley, there is evidence from which Walker can argue that the pictures were material.

A reasonable jury could also find that the other evidence against Walker was overwhelming. The presence or absence of a camera went to Walker's theory of the case, not the prosecutor's. The prosecution's case relied on the officers' testimony and the physical evidence proving that Walker possessed and distributed drugs. The three officers testified consistently, and the drugs introduced into evidence corroborated their testimony. The photographs may have played only a minor, if any, role in that process. The ASA didn't ask either White or Flatley—key prosecution witnesses— about the photographs or use them to supplement their testimony. And the ASA only mentioned the photographs once in her closing argument. Walker's focus on the camera was just a red herring and the photos' omission of a camera couldn't have made a difference—or so a jury might find.

The Cook County defendants insist that the photographs couldn't have been a proximate cause of Walker's injury because Finnelly thought that he was looking for a camera to help the prosecution, not to help Walker, so Walker's injury wasn't foreseeable. *See Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012) (the injury from fabricated evidence should be "of a type that a reasonable person would see as a likely result of his or her conduct" (quoting *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 640 n.1 (7th Cir. 2008))). But there's a dispute about what Finnelly knew, as discussed. In any event, Finnelly's subjective belief doesn't mean Walker's

injury wasn't reasonably foreseeable. Under an objective proximate-cause analysis, an investigator sent to photograph a camera might reasonably foresee that fabricating that camera's absence would affect the fairness of the trial.

Walker has a weak case against Finnelly because there is evidence that Finnelly did not knowingly create false photographs that caused Walker's loss of liberty. But weak cases survive motions for summary judgment, so Finnelly's motion on the evidence-fabrication claim is denied.

### B. Fourth Amendment

Defendants have preserved their argument that Walker's Fourth Amendment claim is untimely, but I reject it. "[A] Fourth Amendment claim for wrongful pretrial detention accrues when the detention ceases." *Lewis v. City of Chicago*, 914 F.3d 472, 478 (7th Cir. 2019). And if the pretrial-detention claim implicates the validity of the underlying conviction, as it does here, then the claim doesn't accrue until the plaintiff receives a favorable termination of his case. *Savory v. Cannon*, 947 F.3d 409, 430–31 (2020). Walker's conviction was vacated and he was released from custody in March 2016. He filed his complaint a few months later, on July 7, 2016, well within the two-year time limit. *See Lewis*, 914 F.3d at 478 (statute of limitations for § 1983 claims in Illinois is two years).

The Fourth Amendment prohibits unreasonable searches and seizures. Arrest and pretrial detention are both seizures and are justified only on probable cause. *Young v. City of Chicago*, 987 F.3d 641 (7th Cir. 2021); *Patrick*, 974 F.3d at 834. Probable cause exists if the facts and circumstances within the arresting officer's

knowledge would allow a prudent person to believe that the suspect had committed or was committing an offense. *Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019). Probable cause is assessed objectively, based on the conclusions that the arresting officer reasonably might have drawn from the information known to him. *Young*, 987 F.3d at 641. Generally, probable cause is an "absolute defense" to a claim of wrongful arrest. *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015).

There's a factual dispute about whether the officers saw Russell sell drugs to Brown, saw Walker throw cocaine out the window, and found cocaine in Walker's sock and car. But Walker doesn't dispute that there was marijuana in plain view in the car's ashtray. He makes no attempt to grapple with that fact in his response brief. Because there was undisputed evidence that a crime had occurred in plain view, the officers had probable cause to arrest Walker. No reasonable jury could find otherwise. *See Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 682 (7th Cir. 2007) ("[P]robable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause."). Summary judgment is granted to all defendants on the false-arrest claim.[12]

Defendants' argument, however, collapses the distinction between false arrest and wrongful pretrial detention. The Supreme Court has recognized a difference between "pre-legal-process[] arrest" and "post-legal process[] pretrial detention."

---

[12] Finnelly was also not involved in Walker's arrest or the decision to detain him. He joined the case in April, two months after Walker's arrest and after Walker's indictment. So summary judgment is granted to Finnelly on all Fourth Amendment claims.

23

*Manuel v. City of Joliet*, 137 S. Ct. 911, 919 (2017). The Fourth Amendment governs both. *Id.*; *see also Kuri v. City of Chicago*, 2021 WL 926288, at *2 (7th Cir. Mar. 11, 2021) (if the detention is not supported by probable cause, the Fourth Amendment provides a remedy). Unlawful pretrial detention occurs "when the police hold someone without any reason before the formal onset of a criminal proceeding," and also when "legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." *Manuel*, 137 S. Ct. at 919.

Walker claims that he was both unlawfully arrested and unlawfully held before trial. Although the marijuana cigarette precludes his false-arrest claim, the record is unclear on whether Walker was detained on that basis as well. The Local Rule 56.1 statements of fact don't mention a judicial probable-cause determination, initial appearance, arraignment, detention hearing, or the like. Nor is there mention of which charges were written up in a criminal complaint. No one disputes that Walker was held pretrial. He testified at his deposition that he was transferred to county jail after the officers processed him at the precinct. [278-11] at 82:17–83:3. He went to bond court right after the transfer, and arraignment court three weeks later. [278-11] at 83:22–84:10, 90:5–7. But the earliest judicial proceeding the parties included as an exhibit in the record is dated April 2006, after Walker was indicted. [278-1]. He was indicted only on the cocaine offenses. And there's reason to think he was never charged with the marijuana in the car: in the defendants' Local Rule 56.1 statement, they cite only to Walker's deposition to support the fact that there was marijuana in

the car. [285] ¶ 29. If a judge based the probable-cause determination solely on the cocaine offenses, a jury could find Reyes, White, and Flatley liable for unlawful pretrial detention. In other words, "legal process itself" may have been compromised if Walker's detention was based "solely on a police officer's false statements." *Manuel*, 137 S. Ct. at 918.

Without evidence showing that Walker was detained on the basis of the marijuana in his car, the officers are not entitled to judgment as a matter of law on the pretrial-detention claim—the dispute over the drug evidence creates a material dispute over the wrongfulness of Walker's detention. Summary judgment is granted to all defendants on the false-arrest claim and to all defendants but Flatley, Reyes, and White on the pretrial-detention claim.

### C. Malicious Prosecution

To succeed on a malicious-prosecution claim under Illinois law, a plaintiff must prove: (1) the defendant commenced an original judicial proceeding; (2) the proceeding was terminated in the plaintiff's favor; (3) the absence of probable cause; (4) malice; and (5) damages. *Lund v. City of Rockford*, 956 F.3d 938, 949 (7th Cir. 2020); *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 26. Only the first and second elements are at issue here.[13]

Although prosecutors decide whether to bring a case, a police officer or investigator may be liable for malicious prosecution if he "played a significant role in

---

[13] Walker appears to argue that his malicious-prosecution claim is grounded in the Fourteenth Amendment, but state law governs the claim. There is "no such thing as a constitutional right not to be prosecuted without probable cause." *Anderson*, 932 F.3d at 512 (quoting *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018))).

causing the prosecution of the plaintiff." *Beaman*, 2019 IL 122654, ¶ 43 (quoting *Frye v. O'Neill*, 166 Ill.App.3d 963, 975 (4th Dist. 1988)). Where the claim is against the arresting officer, an indictment typically breaks the chain of causation, so the plaintiff must show some "postarrest action which influenced the prosecutor's decision to indict." *Colbert v. City of Chicago*, 851 F.3d 649, 655 (7th Cir. 2017) (quoting *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 902 (7th Cir. 2001)). For example, a law-enforcement officer might be liable if he knowingly provides misinformation to the prosecutor, conceals exculpatory information, engages in wrongful or bad-faith conduct instrumental in the initiation of the prosecution, or participates in the case so actively as to amount to advice and cooperation. *Beaman*, 2019 IL 122654, ¶¶ 44–45. The defendant's conduct must have been both a cause in fact and a proximate cause "of the commencement or continuation of the original criminal proceedings." *Id.* ¶ 46.

Finnelly can't be liable for malicious prosecution. Walker was indicted on March 15, and Finnelly didn't become involved in the case until April, when he was assigned to take the pictures. Nothing in the record suggests that Finnelly informally advised the prosecutor before that, or in any way influenced the prosecutor's decision to commence or continue criminal proceedings. Walker's prosecution was in motion well before Finnelly joined the case. In any event, Finnelly's photos alone were not inculpatory and couldn't have been a driving force behind the decision to prosecute Walker. To the extent Walker argues that Finnelly helped obtain his conviction, malicious-prosecution claims against law-enforcement officers are concerned with

those officers who were active "in causing the prosecution," not the ultimate conviction. *Beaman*, 2019 IL 122654, ¶ 44 (quoting 52 Am. Jur. 2d *Malicious Prosecution* § 88 (2018)).

The city defendants argue that White, Daly, Baeza, and Gaynor likewise played insignificant roles in initiating Walker's prosecution. As discussed below, Daly, Baeza, and Gaynor are entitled to summary judgment on the malicious-prosecution claim. But a jury could find that White, Flatley, and Reyes were equally involved in initiating the prosecution. The city defendants appear to take Walker's argument to be that only the cocaine found in his sock was planted. But I read Walker's claim more broadly—that all of the drug evidence used against him was fabricated, including the cocaine found on the passenger seat of the car. *See* [285] ¶¶ 24, 26 (disputing that White found cocaine in Walker's car). True, White's focus at the moment of arrest was on Russell Walker, and it was Reyes who wrote the case report and Flatley who inventoried all the drug evidence. But White gathered and provided evidence that was used against Walker. It was White who purportedly saw Russell talking to Brown in the parking lot of JJ Peppers and White who recovered cocaine from the front passenger seat of the car. Both White and Reyes say they saw the hand-to-hand drug deal. [285] ¶¶ 11, 15, 24. Walker and his brother were indicted together, on the same four charges, for distributing and possessing with intent to distribute the same quantities of cocaine. [278-16] at 1–7. Walker was charged not just with possessing cocaine, but for distributing it as well. So it's reasonable to infer that White's witnessing the sale and recovering some of the cocaine contributed to

the prosecutor's decision to charge Walker. Though the record isn't clear about which officers spoke to the prosecutor before she decided to indict the Walker brothers, an officer may be liable even if he did not "actively deceive prosecutors." *Beaman*, 2019 IL 122654, ¶ 43; *see also Frye v. O'Neill*, 166 Ill.App.3d 963, 975 (4th Dist. 1988) ("Liability for malicious criminal prosecution is not confined to situations where the defendant signed a complaint against the plaintiff."). Rather, liability extends to "all persons who played a significant role in causing the prosecution of the plaintiff," *Beaman*, 2019 IL 122654, ¶ 43 (quoting *Frye*, 166 Ill.App.3d at 975). If a jury found that White planted the cocaine from the car and lied about seeing the drug deal, it could find that he engaged in "bad-faith conduct instrumental in the initiation of the prosecution." *Beaman*, 2019 IL 122654, ¶¶ 44–45. Where White provided some of the (allegedly false) evidence used against Walker, there's a material dispute about his role in initiating the prosecution.

A plaintiff bringing a malicious-prosecution claim must prove that the case was terminated "for reasons that indicate his innocence." *Barnes v. City of Centralia*, 943 F.3d 826, 833 (7th Cir. 2019) (quoting *Filimoniuk v. Nilles*, 2019 IL App (1st) 173198-U, ¶ 28). Under Illinois law, a *nolle prosequi* order doesn't dispose of a case on the merits, but reverts it to the same condition that existed before the prosecution began. *Lund*, 956 F.3d at 949. There are "many reasons" why a state's attorney might nolle pros a case, *id.*, so a bare nolle pros order is not enough to show innocence without "specific reasons for its entry." *Barnes*, 943 F.3d at 833; *see also Lund*, 956 F.3d at 949. The case must be terminated "on the merits" rather than for "procedural or

technical reasons." *Shea v. Winnebago Cty. Sheriff's Dep't*, 746 Fed. App'x 541, 549 (7th Cir. 2019) (quoting *Cult Awareness Network v. Church of Scientology Int'l*, 177 Ill.2d 267 (1997)). The "circumstances surrounding the entry of the *nolle prosequi*" inform whether the plaintiff has met the favorable-termination element. *Cult Awareness Network*, 177 Ill.2d at 279. A nolle pros order does not indicate innocence, for example, if it was the product of an agreement or compromise with the accused, or because it was impossible or impractical to retry him. *Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997).

That Walker obtained a certificate of innocence is enough to create a factual dispute about whether his case was terminated in a manner indicative of his innocence. A state court judge found that he was innocent by a preponderance of the evidence. *See* 735 ILCS § 5/2-702(g)(3). The certificate is not dispositive and has no res judicata effect in federal court; it allows a wrongly convicted person to obtain relief in the Illinois Court of Claims. *Id.* § 5/2-702(j); *Patrick*, 974 F.3d at 833. Though it lacks preclusive effect, a certificate of innocence may be "directly relevant" at trial on a malicious-prosecution claim to prove that the criminal proceeding was terminated consistent with innocence. *Patrick*, 974 F.3d at 833.

The certificate is not inadmissible hearsay, because it is not offered for the truth of an assertion of innocence, but for its existence as a circumstance under which Walker's conviction was vacated. The distinction is subtle, but any risk of prejudice would be mitigated with "[w]ell-crafted jury instructions." *Id.* For example, the court of appeals pointed favorably to the jury instructions the district court gave in *Harris*

29

*v. City of Chicago*, 2018 WL 2183992, at *5 (N.D. Ill. May 11, 2018). *Patrick*, 974 F.3d at 833. So too here, the jury would be told that the certificate was admitted for a limited purpose.

Beyond the certificate, a jury might find that Walker's case was terminated on the merits—both the trial judge who vacated his conviction and the judge who granted the certificate of innocence implied that the camera's existence called into question the veracity of the officers who provided drug evidence against Walker. On the other hand, they both stopped short of adopting Walker's assertion that the officers framed him. And there's evidence that Walker's case was terminated to remedy investigative and procedural errors before and during trial, not because Walker was actually innocent of the underlying drug crimes. A jury would have to draw inferences from the evidence to characterize the termination of Walker's prosecution. White, Reyes, and Flatley's motion for summary judgment is denied.

### D. Intentional Infliction of Emotional Distress

To prove intentional infliction of emotional distress under Illinois law, Walker must prove that (1) defendants' conduct was extreme and outrageous; (2) defendants intended their conduct to inflict severe emotional distress, or knew that there was a high probability that their conduct would inflict such distress; and (3) the conduct caused severe emotional distress. *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 467 (7th Cir. 2016); *Bailey v. City of Chicago*, 779 F.3d 689, 696–97 (7th Cir. 2015). The conduct must be "so outrageous in character" and "so extreme in degree" as to "go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

30

intolerable in a civilized community." *Schweihs v. Chase Home Fin., LLC*, 2016 IL 120041, ¶ 51 (quoting Restatement (Second) of Torts § 46 cmt. D, at 73 (1965)).[14]

The city defendants don't dispute that a jury could find Reyes and Flatley's alleged conduct extreme and outrageous. Framing someone for multiple felonies by planting drugs on him and lying under oath at trial is outrageous conduct that a civilized society would find utterly intolerable. Defendants focus their argument on the other four officers. But as discussed above, White's participation in the alleged scheme is up for debate. Here too, defendants don't persuasively distinguish White's involvement from Reyes and Flatley's. Walker's claim is that the officers planted all of the drug evidence introduced against him at trial—including the cocaine White says he found in the car. White provided evidence that he had seen a drug sale, recovered packets of cocaine from the passenger seat of Walker's car, and later identified those packets as People's Exhibit 14. [278-15] at 12, 15–16.[15] If a jury concluded that Reyes and Flatley fabricated drug evidence—thus committing intentional infliction of emotional distress—it could reasonably find that White did, too.

---

[14] Defendants have preserved their argument that the intentional infliction of emotional distress claim is untimely. [279] at 32; *see* [99] (rejecting defendant's motion to dismiss claim as untimely).

[15] Illinois courts have applied the *Briscoe* immunity rule to liability for state-law torts, so the officers would be immune based on their testimony alone. *See Barnes v. Martin*, 2014 IL App (2d) 140095-U, ¶ 57; *see also Nichols v. Fahrenkamp*, 2019 IL 123990, ¶ 15. The outrageous conduct would be the officers' actions in the course of their investigation, plus their testimony authenticating and introducing the fabricated evidence.

A jury could also find that Finnelly acted in an extreme or outrageous way by intentionally creating misleading evidence, knowing that doing so would cause extreme emotional distress. A jury could credit Finnelly's testimony that he simply missed the camera, as defendant's own investigator did, or had bad information about where he was supposed to look. But as discussed above, it could find that he knowingly staged the photos to omit the camera. Whether it was an oversight or an intentional omission is a credibility determination best left to the jury. And whether it was Finnelly's evidence that caused Walker's injury is a disputed issue of fact. Finnelly's motion for summary judgment is denied.

### E. Individual Defendants

The city defendants move for summary judgment on all of the § 1983 claims against Daly, Gaynor, and Baeza because they did not personally participate in any of the alleged constitutional violations. Walker makes no attempt to parse the actions or liability of any of the individual defendants in his response brief, so any argument on that front is waived. *Delapaz v. Richardson*, 634 F.3d 895, 900 (7th Cir. 2011). I nevertheless address the defendants' arguments in the interest of completeness.

No jury could find that Daly, Gaynor, and Baeza were personally involved in either the Fourth Amendment or due-process violations, as required for liability under § 1983. Gaynor and Baeza responded to the alley in response to Flatley's radio call about chasing Brown. By the time Gaynor and Baeza arrived, Brown and the Walker brothers were already detained. Neither officer interacted with the Walker brothers or with Brown in the alley or recovered any of the evidence later used against

Walker. They didn't search him, didn't write a case report, didn't contribute to the decision to detain him, and would have had no opportunity to fabricate evidence. So neither Gaynor nor Baeza could have been personally involved in detaining Walker, or in fabricating any dug evidence. Based on this record, their only involvement was briefly responding to the alley.

Likewise, Daly's role in the arrests and postarrest processing was minimal. Daly was on patrol with White, Reyes, and Flatley. After the officers pulled into the alley, Flatley chased Brown, and Daly returned to the patrol car to follow, but ended up not needing to. While Flatley dealt with Brown, Reyes and White approached the Walker brothers. Daly wasn't involved in either Walker's arrest or recovery of any evidence. He was at the police station following the arrests, but never communicated with Walker or his brother, did not conduct any custodial search, and did not write a case report. He didn't testify at trial. Walker hasn't pointed to evidence from which a jury could find that Daly personally participated in detaining Walker or fabricating drug evidence against him.

For the same reasons, Walker hasn't marshaled evidence from which a jury could find that Daly, Gaynor, or Baeza played a significant role in initiating his prosecution, or that they committed any extreme or outrageous conduct. So summary judgment is granted to those three officers on the evidence-fabrication, Fourth Amendment, malicious-prosecution, and intentional infliction of emotional distress claims.

## F. *Conspiratorial Liability*

Walker advances a number of claims to try to broaden the scope of the alleged scheme beyond its primary participants, White, Reyes, and Flatley. These include failure-to-intervene and federal and state conspiracy claims.

### 1. **Federal Conspiracy**

To prove a conspiracy under § 1983, Walker must prove that the defendants reached an agreement to deprive him of his constitutional rights, and that a member of the conspiracy took an overt act to deprive him of those rights. *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018). He must show an underlying constitutional violation and demonstrate that the defendants agreed to inflict the constitutional harm. *Id.* In the § 1983 context, conspiracy is not a separate claim from the underlying constitutional violation—it is a way of proving that a defendant is legally responsible for that violation. *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) (conspiracy is "not an independent basis of liability in § 1983 actions").

Because conspiracies are often "carried out clandestinely," direct evidence is rarely available, and plaintiffs may rely on circumstantial evidence. *Daugherty*, 906 F.3d at 612 (quoting *Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015)). A government official is a coconspirator if he voluntarily participates in a "common venture." *McCann v. Mangialardi*, 337 F.3d 782, 789 (7th Cir. 2003) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)). Under both federal and state conspiracy law, the official need not have agreed on the details of the conspiratorial scheme, but he must understand the "general objectives of the scheme," accept them,

34

and agree, either explicitly or implicitly, to do his part to further them. *Id.* at 789–90 (quoting *Jones*, 856 F.2d at 992) (federal law); *see Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 939 (7th Cir. 2012) (Illinois law).

No evidence supports Walker's contention that the CPD officers conspired with Finnelly to create misleading evidence about the camera in the alley. Finnelly worked for a separate entity, the State's Attorney's Office, not the CPD. Typically, once the arresting officers gave the case to the State's Attorney's Office, the officers' involvement investigating the case ended. [285] ¶ 48. Finnelly didn't join the case until April 2006, well after the State's Attorney's Office took over from the CPD. The officers and Finnelly say that they have never spoken to each other, and never talked about the investigation of Walker's case, [285] ¶¶ 4, 50, and Walker points to no evidence from which a jury could find otherwise. That Finnelly worked in the Gang Crimes Unit of CPD does not support an inference that he conspired with the officer-defendants. Finnelly left the CPD for the State's Attorney's Office in 1993, years before the other defendants even joined the CPD. [278-3] at 9:1–22. White joined the CPD around 1995, Reyes was hired in 1998, Flatley and Daly joined in 1999, and Baeza in 2000. [278-5] at 15:3; [278-6] at 11:20; [278-7] at 11:6–7; [278-8] at 10:11–12; [278-9] at 8:18. Simply passing through the same CPD unit would have been insufficient to show that the officers conspired with Finnelly, and the evidence of an agreement is nonexistent here since the officers and Finnelly did not work for CPD at the same time. Finally, as discussed, there's no evidence that the officers were involved in creating the photographs. So there's no joint action or similar course of

35

conduct by Finnelly and the officers that would allow a jury to infer that there must have been an agreement among them. Summary judgment is granted to Finnelly on the conspiracy claim.

The evidence supports an inference that Flatley, Reyes, and White had an agreement. If a jury found that the three of them fabricated the drug evidence, that finding would necessarily imply they had an agreement to do so—it's highly improbable that three officers would independently decide to plant drugs on a suspect without consulting each other first. *See generally Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (reversing dismissal of conspiracy claim based on harassment where it was "a challenge to imagine a scenario in which that harassment would not have been the product of a conspiracy"). But Walker points to no evidence that Daly, Gaynor, and Baeza were party to any agreement or involved in the scheme. Gaynor and Baeza weren't on patrol with the other officers, arrived on the scene after the arrests had already been made, and weren't involved in searching Walker or his brother. Daly arguably had more of an opportunity to conspire with the other three officers because he was in the patrol car with them initially. But Flatley, Reyes, and White were the officers who recovered the drugs Walker was charged with possessing and distributing. Daly wasn't involved in arresting Walker or his brother, never spoke to either of them, didn't recover any drug evidence, didn't search Walker at the station or write up a case report, and didn't testify at Walker's trial. True, Daly doesn't need to be the one who acted in furtherance of the conspiracy to have been a part of it, so long as some other party to the conspiracy committed an overt act. But there must be

36

some evidence that Daly understood the "general objectives of the scheme," and agreed to further those objectives. *Jones*, 856 F.2d at 992. Walker identifies no evidence from which a jury could find that Daly was aware of a scheme to frame Walker and that he agreed to help. Even if Daly knew about the alleged misconduct, knowledge alone is typically insufficient to support the existence of an agreement absent evidence that Daly expressly or tacitly agreed to participate in the scheme. *See Daugherty*, 906 F.3d at 612. So summary judgment is granted to Gaynor, Baeza, and Daly.

The point of civil conspiracy is to "spread[] the net of liability to additional persons" for a substantive violation. *Niehus v. Liberio*, 973 F.2d 526, 531–32 (7th Cir. 1992). A jury could only find Reyes, White, and Flatley liable for conspiracy. Those are the same three officers who will face substantive claims of evidence fabrication and unlawful pretrial detention. So the conspiracy theory adds nothing to the case. It doesn't rope in another defendant or cover additional conduct, and Walker may only recover once for the same injury. *See Boothe v. Sherman*, 66 F.Supp.3d 1069, 1077 (N.D. Ill. 2014) (if state actor defendants violated plaintiff's rights, then the conspiracy charge "adds nothing to the case," as § 1983 plaintiffs "may recover only once for each injury"); *see also Gramenos v. Jewel Cos.*, 797 F.2d 432, 435 (7th Cir. 1986) ("If the arrest was constitutionally unreasonable, then the police are liable under § 1983 without regard to the 'conspiracy', and if not, not."). Put differently, although claims for "alleged conspiracies between state actors are possible under section 1983," they generally "add nothing but needless complexity." *Ewell v. Toney*,

853 F.3d 911, 917–18 (7th Cir. 2017); *Scott v. City of Chicago*, 619 Fed. App'x 548 (7th Cir. 2015) (where all members of alleged conspiracy were state actors, "a conspiracy claim ha[d] no role to play"). Because the conspiracy claim is redundant and unnecessarily complicates the case, the jury will not be asked to find liability on a separate § 1983 conspiracy.[16]

### 2. State Conspiracy

The elements of a state-law conspiracy are similar to federal-law conspiracy. Walker must prove that two or more people agreed to participate in an unlawful act, and that one of the parties performed a tortious act in furtherance of the agreement

---

[16] Because the conspiracy theory against Flatley, Reyes, and White adds nothing to the case and is not an independent cause of action on which the jury will return a verdict, there's no reason to resolve the officers' argument that they are entitled to qualified immunity. In the interest of completeness, I simply note that I don't agree that qualified immunity applies here. Qualified immunity protects government officials from liability for civil damages unless their conduct violates a clearly established right. *Henry v. Hulett*, 969 F.3d 769, 785 (7th Cir. 2020). The right to be free from detention without probable cause and the right to not be tried on fabricated evidence were clearly established in 2006. *See Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) (there was "no disputing" that fabricating evidence "violates clearly established constitutional rights"); *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000) ("[I]t was clearly established that a citizen may not be detained by law enforcement officials without probable cause."). The officers' argument is based on the unsettled application of the intracorporate conspiracy doctrine to police officers from the same police department under § 1983. In antitrust cases, the intracorporate conspiracy doctrine holds that "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). The Court reasoned that because the law is unsettled on whether the doctrine applies to conspiracies under § 1985(3), the defendants were entitled to qualified immunity. 137 S. Ct. at 1868–69. But § 1983 conspiracies are different. Section 1985(3) creates substantive liability for a conspiracy, whereas conspiracy under § 1983 is a theory of responsibility for an underlying constitutional violation. It would make little sense to preclude liability for conspiracy when conspiracy itself is not a standalone violation for which a defendant can be liable in the first place. In other words, the § 1983 conspiracy is not unlawful, the constitutional tort is the unlawful act. So long as it is properly understood that conspiratorial responsibility is simply a method of proof for an officer's personal involvement in a constitutional tort under § 1983 and so long as the underlying constitutional right is clearly established, qualified immunity does not apply.

that caused an injury. *Fritz v. Johnston*, 209 Ill.2d 302, 317 (2004). Conspiracy is not a separate tort in Illinois either; it is a means of establishing vicarious liability among coconspirators for an underlying tort. *Merrilees v. Merrilees,* 2013 IL App (1st) 121897, ¶ 49. Like federal conspiracy, a plaintiff may prove state conspiracy with circumstantial evidence. *Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 66 (1994).

For the reasons just discussed, Walker hasn't marshaled evidence from which a jury could find that anyone other than White, Reyes, and Flatley agreed to commit an underlying tort. And again, the function of a conspiracy claim "is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts." *Adcock*, 164 Ill.2d at 62. Walker's state-law conspiracy claim doesn't add a different defendant. If a jury found Reyes, Flatley, and White liable for malicious prosecution, there's no need to rely on a conspiracy theory. As in the federal context, Walker "may obtain only one recovery for an injury." *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill.2d 460, 486 (1998). There is complete overlap between the substantive and the conspiratorial conduct alleged. *See Powell v. City of Berwyn*, 68 F.Supp.3d 929, 950 (N.D. Ill. 2014) ("Conspiracy alleging a tort as the underlying wrongful act is actionable, as long as it includes additional defendants or new facts not already pled in the underlying tort." (quoting *Real Colors, Inc. v. Patel*, 974 F.Supp. 645, 651 (N.D. Ill. 1997))). *Cf. Dowd*, 181 Ill.2d at 486 (dismissal of conspiracy claim as duplicative was premature where conspiracy allegations were "not subsumed under another theory of recovery" and one defendant was named in conspiracy claim but not elsewhere).

Walker may propose a jury instruction on conspiratorial liability at trial. But to the extent he pleads standalone claims of conspiracy, defendants are entitled to judgment as a matter of law because conspiracy is not a separate claim.

### 3. Failure to Intervene

To prove failure to intervene under § 1983, Walker must prove that the defendants knew that a constitutional violation was committed and had a realistic opportunity to prevent it. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). Like conspiracy, failure to intervene is a mechanism to hold additional defendants liable for an underlying constitutional violation. As with the conspiracy claims, a jury could find that Flatley, Reyes, and White knew about their fellow officers' plan to plant drugs on Walker and realistically could have stopped it. But Walker points to no evidence that Daly, Gaynor, Baeza, or Finnelly knew about the scheme. They are entitled to judgment as a matter of law on the failure-to-intervene theory.

### G. Derivative Liability Claims

The respondeat superior and indemnification claims derive from the underlying claims, so they survive to the extent the underlying claims survive. The defendants' motions for summary judgment on the derivative claims is denied.

## IV. Conclusion

Defendants' motions for summary judgment [275], [277] are granted in part, denied in part. Walker may proceed on his evidence-fabrication claim as to the drugs, failure to intervene, unlawful pretrial detention, malicious prosecution, and intentional infliction of emotional distress against White, Reyes, and Flatley. Walker

may proceed against Finnelly on fabrication of the photographs and intentional infliction of emotional distress. The respondeat superior and indemnification claims survive summary judgment. Summary judgment is granted on all other claims and to all other defendants.

ENTER:

Manish S. Shah
United States District Judge

Date: March 19, 2021